In the Matter of CARLOS CARRERO, Appellant, v NEW YORK CITY HOUSING AUTHORITY, Respondent.

First Department, March 27, 1986

### APPEARANCES OF COUNSEL

*Thomas M. Kennedy* of counsel *(Ira Cure* with him on the brief; *Lewis, Greenwald, Kennedy & Lewis, P. C.,* attorneys), for appellant.

*Joan Pannell* of counsel *(Gary Landau* with her on the brief; *Charles E. Williams, III,* attorney), for respondent.

### OPINION OF THE COURT

MURPHY, P. J.

Petitioner Carlos Carrero was appointed to the New York

City Housing Authority police force as a probationary officer on January 5, 1983. He had graduated from the police academy in the top half of his class, and after his appointment served his probationary term performing in a uniformly able manner, and on at least one occasion with distinction for which he was commended by New York County District Attorney Robert Morgenthau. His probation performance evaluation indicates that petitioner met the standards of the force in all respects, and that in some areas, notably appearance and fitness, he exceeded force standards.

Nearly one year after his appointment, petitioner's medical records were reviewed by Dr. Edwin Y. Fondo, the Housing Authority police surgeon. Dr. Fondo noted that petitioner had been hospitalized in 1978 and in 1982 with what Fondo took to be kidney stones. Based on his apparent history of kidney stone formation, petitioner was ordered to submit a doctor's opinion indicating the status of his kidney stone problem. Petitioner responded by submitting letters from three urologists who examined him on separate occasions between February 28, 1984 and March 6, 1984. All three highly qualified urologists agreed that petitioner had a kidney stone but that once the stone was removed petitioner would be able to discharge the normal duties of a police officer unimpaired. Heeding the advice of these doctors, petitioner entered the hospital on March 8, 1984 and had the kidney stone surgically removed. Thereafter, he eventually returned to full active duty.

In June 1984, Dr. Fondo again reviewed petitioner's medical records and concluded based on petitioner's history that he presented a high probability of future stone formation. The possibility that renal distress would render petitioner incapacitated in an emergency was deemed sufficient to terminate his probationary appointment to the force. Accordingly, petitioner was notified on June 12, 1984 that he would be discharged from his position as of June 15, 1984. Petitioner's termination was, however, held in abeyance due to concerns expressed by his supervising officers and his congressman. In the interim, he was asked to submit to examination by a urologist selected by the Housing Authority. Housing Authority Chairman, Joseph J. Christian, in a letter to Representative Mario Biaggi, which is included in the record before the court, expressed the hope that "this independent medical opinion can resolve this matter."

Dr. Carl Pellman examined petitioner at the Housing Authority's request on June 18, 1984. Dr. Pellman is a board certified urologist and an associate clinical professor of urology at New York Medical College. In his report to the Housing Authority dated June 29, 1984, he indicated that standard tests did not reveal petitioner possessed any abnormal propensity for kidney stone formation. To the contrary, petitioner's physical examination yielded entirely normal findings. As to petitioner's fitness to perform his police duties, Dr. Pellman stated categorically: "There is nothing in this examination and evaluation which would prevent him from adequately discharging the duties of a housing policeman."

Dr. Pellman's report notwithstanding, petitioner's employment was terminated as of July 3, 1984 for failure to meet the medical standards for permanent appointment to the Housing Authority police force.

The present proceeding pursuant to CPLR article 78 followed. Petitioner alleged that his termination was arbitrary and capricious and contrary to Executive Law § 296 forbidding employment discrimination based on physical disability. The petition was dismissed by Special Term without a hearing after which petitioner took this appeal.

■ We begin by noting the oft-cited rule that a probationary employee may be terminated without a hearing and for unstated reasons but may not be terminated for reasons prohibited by law (Matter of Miller v Ravitch, 60 NY2d 527, 531; Matter of Talamo v Murphy, 38 NY2d 637, 639). Petitioner's termination is expressly based upon his alleged disability. There is no doubt that even from probationary status petitioner may challenge his termination for disability as being contrary to law. (Matter of Miller v Ravitch, supra, at p 531; Matter of Talamo v Murphy, supra, at p 639.) Nor is there the slightest doubt after Matter of Miller v Ravitch (supra) that such a challenge may be mounted in the context of an article 78 proceeding. In Miller, procedurally indistinguishable from the within proceeding, a probationary railroad clerk was allowed to maintain an article 78 proceeding to challenge his demotion on the ground that, as in the present case, it was accomplished in violation of Executive Law § 296.

Respondent urges that petitioner has an untreated or untreatable disease of the urinary tract rendering him unfit for police service. Individuals with an untreated or untreatable urinary tract disease are disqualified from police service in

observance of medical standards promulgated by the Municipal Police Training Council pursuant to Executive Law §§ 839 and 840 (2). The applicable regulation is found at 9 NYCRR 6000.6 (15).

Medical standards governing qualification for police employment must, however, be harmonized with other relevant legal provisions. In particular, Executive Law § 296 (1) (a) makes it unlawful "[f]or an employer or licensing agency, because of the * * * disability * * * of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." In Executive Law § 292 (21) a "disability" is defined as: "(a) a physical, mental or medical impairment resulting from anatomical, physiological or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques or (b) a record of such an impairment or (c) a condition regarded by others as such an impairment, provided, however, that in all provisions of this article dealing with employment, the term shall be limited to disabilities which do not prevent the complainant from performing in a reasonable manner the activities involved in the job or occupation sought or held" (as amended by L 1979, ch 594 and L 1983, ch 902).

Prior to the statute's amendment in 1979, to be disabled within the meaning and, therefore, the protection of the Executive Law, one's disability had to be entirely unrelated to the ability to engage in a particular job or profession (Executive Law § 292 [former 21]). Legislative desire to bring State law into conformity with stricter Federal provisions proscribing improper discrimination against the handicapped prompted the Executive Law's 1979 amendment bringing within the law's protection anyone whose disability did not prevent the reasonable performance of his or her job or profession.

The amended law has been liberally construed by the Court of Appeals. In his opinion in *Matter of Miller v Ravitch (supra,* p 532), then Associate Judge Wachtler pointedly observed: "Under the current statute, then, it is not enough for the employer to show that the employee's physical impairment is somehow related to the duties he must perform in the position sought. Nor is it sufficient to show that the impairment precludes the employee from performing the duties in a

perfect manner. The statute bars discrimination against an impaired individual who is reasonably able to do what the position requires. Unless it is shown that the employee's physical condition precludes him from performing to that extent, the disability is irrelevant to the job and can form no basis for denying him the position."

Respondent concedes that its actions must conform to the requirements of the Executive Law, and argues at length that the regulations which it claims dictated its decision to terminate petitioner's employment were promulgated specifically in response to the 1979 amendment of Executive Law § 292 (21). Respondent points out that the Training Council states its concern with developing standards that do not improperly discriminate under either Federal or State law at 9 NYCRR 6000.1.

■ We have no quarrel with the Training Council regulations cited to support petitioner's termination. Nor do we question the authority of respondent's duly appointed medical examiner to disqualify a probationary employee for a defect which in his informed opinion would predictably interfere with the reasonable performance of police duties. (See, 9 NYCRR 6000.3.) On the present state of the record, however, we find it impossible to conclude that respondent has made a good-faith effort to evaluate the extent to which petitioner's alleged impairment will interfere with the reasonable performance of his duties as is required by respondent's governing regulations and Executive Law § 296 (1) (a).

Respondent maintains that petitioner suffers from an untreated or untreatable disease of the urinary tract. Yet this seems a manifestly unsupportable position. Petitioner's kidney stone was surgically removed. Dr. Pellman, the urologist selected by respondent to examine petitioner after his surgery states unequivocally that all studies show petitioner's renal functions to be normal. Testing has revealed no organ dysfunction predisposing petitioner to further stone formation. Plainly, petitioner's kidney stone was successfully treated, and all objective data leads to the conclusion that he is now free of any underlying renal disease. Respondent urges, however, that since the etiology of petitioner's stone formation remains unknown, his condition is untreatable. Yet, many maladies whose causes are obscure are nevertheless treatable. The etiology of many forms of cancer and heart disease, for example, remains unknown, but no one would suggest that these diseases are, therefore, untreatable. Indeed, a disease may be

effectively controlled or even cured while its etiology is unexplained.

Semantics aside, respondent's termination of petitioner may not rest legally on the unsupported hypothesis that petitioner suffers from a mysterious renal disease which may or may not become symptomatic at some unspecified future time. In construing Executive Law § 292 (21), the Court of Appeals has observed: "Disabilities * * * often develop gradually and, under the statutory definition, an employer cannot deny employment simply because the condition has been detected before it has actually begun to produce deleterious effects." *(State Div. of Human Rights v Xerox Corp.,* 65 NY2d 213, 219.) Respondent's interpretation of the phrase "untreatable disease of the urinary tract" to encompass any condition of unknown etiology, however quiescent, forces the otherwise unobjectionable regulation in which the language is found *(i.e.,* 9 NYCRR 6000.6 [15]) to run afoul of Executive Law §§ 296 and 292 (21) as interpreted by the Court of Appeals in *Xerox* and *Matter of Miller v Ravitch (supra).* It effectively sanctions the dismissal of an employee whose alleged disability presents neither a current impediment to his job performance nor a rationally based likelihood of future occupational incapacity.

Such a result is clearly not dictated by the applicable regulations which provide explicitly that "urinary tract infection can be proven benign and should be considered as any other remediable defect." (9 NYCRR 6000.4 [a] [1].) Thus, in determining whether petitioner is to be disqualified for an "untreatable disease of the urinary tract", the question is not one of underlying etiology, but whether the condition, assuming it to exist, can be proven benign. The record before us gives strong indication that petitioner has no underlying urinary tract disease, and that even if there is a residual condition it has been rendered benign through treatment.

Respondent may, of course, rely on the opinion of its duly appointed medical examiner. But such reliance is not a substitute for the adequate address of legally pertinent questions. Nor is such reliance rendered efficacious when the record indicates that the medical examiner's opinion may well be ill-founded.

As noted above, the legally pertinent issue is not whether petitioner suffers from an arcane renal disorder, but whether the disorder, supposing it to exist, interferes with the reasonable performance of petitioner's duties. Dr. Fondo's entirely

conclusory scenario postulating, for an undisclosed reason, indeed according to respondent an undisclosable reason, a high probability of future stone formation and ensuing colic attacks rendering petitioner unable to respond in an emergency is hardly convincing. Dr. Fondo's conclusions do not appear to be in accord with relatively current medical assessments of petitioner and reflect what seems to be a serious misreading of petitioner's medical history. We note that Dr. Fondo's only examination of petitioner was so brief and cursory as not to receive any mention in his affidavit in opposition to the within petition. In arriving at his determination as to petitioner's current fitness for police work then, Dr. Fondo must have relied on the assessments of the specialists who performed thorough examinations on petitioner. Yet, Dr. Fondo's conclusions directly contradict those of each of the four highly qualified specialists who examined petitioner. Of course, one set of facts may give rise to varied opinions, but this does not appear to be a case of mere difference in opinion. As Dr. Pellman reiterates in his affidavit, all of the most recent objective studies done on petitioner show no sign of renal disease or evidence of organ dysfunction predisposing petitioner to new kidney stone formation. It is simply not possible to support petitioner's disqualification based on the scientific data reflecting petitioner's current condition, which data, we might add, was obtained at respondent's request.

The sole remaining factual basis for Dr. Fondo's determination appears to be petitioner's medical history. Specifically, Dr. Fondo points to two previous hospitalizations for what he takes to be urinary tract infection. It is undisputed that in 1978 while hospitalized petitioner passed a kidney stone. However, Dr. Fondo, who is not a urologist, has palpably misconstrued the record regarding the cause of petitioner's 1982 hospitalization. Dr. Pellman points to several misstatements by Dr. Fondo regarding factual material in the 1982 hospital record. Contrary to Dr. Fondo's affidavit, the record shows that petitioner's urine during his 1982 admission was normal. Further, X-ray reports from the same hospitalization did not describe a calculus (or stone) as suggested by Dr. Fondo, but calcific densities requiring further study to diagnose correctly. Subsequent studies conclusively demonstrated that there were no kidney stones in petitioner's urinary tract. We note, as is plain from the 1982 hospital chart, that petitioner was discharged with a final diagnosis of lumbar sacral myositis (back muscle inflammation). Kidney stones and

urinary tract disease were alternative diagnoses which, contrary to Dr. Fondo's suggestion, were conclusively eliminated in light of negative diagnostic studies.

Aside from the tenuous factual underpinning for Dr. Fondo's assessment of petitioner's alleged impairment, our attention is drawn to Dr. Fondo's manifest failure to evaluate the severity of the impairment in light of recent advances in kidney stone treatment which, as Dr. Pellman points out, have rendered incapacitating surgery to remove ureteral calculus all but obsolete. Nor is any consideration given the fact that petitioner's condition, supposing it to exist, can be and is being urologically monitored to prevent the sudden onset of renal distress.

Given the apparently serious deficiencies underlying the opinion upon which respondent relies exclusively, as well as the failure of respondent to realistically assess the nature and extent of the claimed impairment, and given the sharply contrasting views of every other expert whose opinion was obtained, we are hard pressed not to find respondent's action in disqualifying petitioner arbitrary and capricious. We are, however, mindful of the rigorous physical demands placed upon police officers, and of the crucial importance of physical fitness in enabling an officer to respond to emergency situations. Moreover, despite our reservations concerning Dr. Fondo's judgment in this matter we are not in a position to evaluate his credibility or that of the doctors cited in petitioner's support. We do, however, think that petitioner has made a strong prima facie showing of impermissible discrimination, and that this showing is more than sufficient to raise an issue of fact as to whether petitioner's disability or record thereof interferes with the reasonable discharge of his police duties. *(See, Matter of Miller v Ravitch,* 60 NY2d 527, 533, *supra.)* Given the sharply divergent expert views, this question cannot be finally resolved on the basis of the record before us. Rather, a full evidentiary hearing is required pursuant to CPLR 7804 (h).

In reversing Special Term's dismissal of the within petition and remanding for further proceedings, we do not subject respondent's determination to any greater scrutiny than is otherwise warranted in a proceeding pursuant to CPLR article 78. We hold simply that when a petitioner has made a prima facie showing of improper discrimination based on physical disability, or as in this case, a history thereof *(see,* Executive Law § 292 [21] [b]), that respondent must come forward with

competent evidence showing that its decision to terminate petitioner's services was rationally based. This means that respondent must demonstrate that there are rational grounds for determining that petitioner's disability renders him unfit to reasonably discharge the tasks of his employment. *(See, Matter of Miller v Ravitch, supra,* at p 532.)

Accordingly, the judgment, Supreme Court, New York County (Ira Gammerman, J.), entered January 15, 1985, dismissing petitioner's CPLR article 78 petition, is unanimously reversed, on the law, without costs, the petition reinstated, and the matter remanded for further proceedings pursuant to CPLR 7804 (h).

SANDLER, ASCH, KASSAL and ELLERIN, JJ., concur.

Judgment, Supreme Court, New York County, entered on January 15, 1985, unanimously reversed, on the law, without costs and without disbursements, the petition reinstated, and the matter remanded for further proceedings pursuant to CPLR 7804 (h).